**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 09 B 17582 |
| | ) | Chapter 11 |
| NACHSHON DRAIMAN, | ) | Judge John H. Squires |
| | ) | |
| Debtor. | ) | |

# MEMORANDUM OPINION

These matters come before the Court on confirmation of the fourth amended Chapter 11 plan of reorganization (the "Plan") filed by Nachshon Draiman (the "Debtor") and the objections thereto filed by Dynegy Marketing and Trade ("Dynegy") and on the motion of Dynegy to dismiss or convert the case.[1] For the reasons set forth herein, the Court sustains in part Dynegy's objections and denies confirmation of the Plan. In addition, the Court denies Dynegy's motion to dismiss or convert the Debtor's case. Because the Court has denied confirmation of the Plan and the case has been pending for approximately two years, the Court sets a hearing on May 24, 2011, at 10:00 a.m. to determine whether the case should be converted to Chapter 7 or dismissed.

## I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain these matters pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. Additionally, whether the Court should confirm the Plan is a core proceeding under

[1] Objections to the Plan were also filed by Bank of America, N.A. and Morris Esformes. Bank of America withdrew its objection on December 13, 2010. (Docket No. 578.) On December 16, 2010, Morris Esformes withdrew his objection to the Plan. (Docket No. 587.) Accordingly, those objections will not be further discussed.

28 U.S.C. § 157(b)(2)(L). The motion to dismiss or convert the case is also a core proceeding under §§ 157(b)(A) and (O).

## II. FACTS AND BACKGROUND

On May 14, 2009, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code. (Dynegy Ex. No. 1.) Pursuant to 11 U.S.C. §§ 1107 and 1108, the Debtor has continued in possession of his assets and has conducted his business and managed his financial affairs as a debtor-in-possession. Dynegy is a Colorado general partnership with its principal place of business in Houston, Texas.

The Debtor has interests in healthcare, real estate, and energy procurement (natural gas and electricity). (Debtor Ex. No. 6 at p. 24.) The Debtor is the sole proprietor of Future Associates, a management and consulting firm that operates several nursing facilities in the Chicago area. (*Id.*) Further, the Debtor is the president of Lifescan Laboratory, Inc. ("Lifescan"), a medical testing laboratory. (*Id.*) He also is the manager or member in three area nursing home facilities–Embassy Health Care Center, Inc., Peterson Park Nursing Home, and Burnham Health Care Center. (*Id.* at pp. 24-25.) The Debtor is a partner in MNRE Ventures, LLC ("MNRE") a real estate partnership that owns and leases nine residential condominiums in Chicago. (*Id.* at pp. 10 & 25.) MNRE owns six condominium units which are currently in foreclosure. (*Id.* at p. 10.)

The Debtor has been active in the healthcare field since the 1970s (Trans. 15:18 - 23) and has been involved in the purchase and sale of approximately fifteen to twenty nursing homes. (*Id.* at 16:4 - 10.) In addition, the Debtor is the president and sole shareholder of Multiut Corporation ("Multiut"), a supplier of natural gas and electrical energy services. (Debtor Ex. No. 6 at p. 24;

Trans. 350:24 - 351:4.) Multiut filed a separate Chapter 11 bankruptcy petition (09 B 17575) on May 14, 2009. The Debtor's income is derived from salaries and management and consulting fees from these various businesses. (Debtor Ex. No. 6 at p. 25.)

The Debtor and Multiut have been involved in litigation with Dynegy since 2002. (*Id.* at p. 26.) Dynegy filed a complaint against the Debtor and Multiut in the United States District Court for the Northern District of Illinois (the "Illinois Litigation"). Dynegy alleged that Multiut failed to pay for natural gas that was delivered to it in 2000, 2001, and 2002. The Debtor was named in the lawsuit as a guarantor of the payments owed by Multiut. On June 11, 2008, the District Court entered a judgment in the amount of $15,348,244.72 plus interest against Multiut and the Debtor. (Dynegy Ex. Nos. 14 & 30.) The District Court denied a motion to reconsider that judgment. (Dynegy Ex. No. 30.) An appeal was filed before the Seventh Circuit Court of Appeals. (Debtor Ex. No. 6 at pp. 20, 26-27.) The Seventh Circuit denied Multiut's and the Debtor's motion to stay enforcement of the judgment. (Dynegy Ex. No. 34.) On June 23, 2010, the District Court denied a second motion to reconsider. (Debtor Ex. No. 6 at p. 20; Dynegy Ex. No. 30.) Thereafter, on July 16, 2010, the District Court entered an amended judgment that specified that the amount with interest due to Dynegy by Multiut and the Debtor is $22,623,392.18. (Debtor Ex. No. 6 at pp. 20 & 27; Dynegy Ex. Nos. 14 & 30.) On July 30, 2010, the Debtor filed a second notice of appeal with the Seventh Circuit. (Debtor Ex. No. 6 at p. 27.) The Seventh Circuit set oral arguments for January 12, 2011. (Trans. 76:22 - 77:3.) That matter is still pending as of this date.

Multiut filed a lawsuit against Dynegy in December 2004 in the District Court for the Northern District of Illinois. (Debtor Ex. No. 6 at p. 27.) In this suit, Multiut alleged that Dynegy

violated the Sherman Antitrust Act, the Illinois Consumer Fraud and Deceptive Trade Practices Act, and committed fraud. (*Id.*) Specifically, Multiut alleged that Dynegy intentionally manipulated price indices resulting in improperly higher charges to its customers, including Multiut. In January 2005, that case was transferred to a multi-district docket pending in the United States District Court of Nevada (the "MDL"). (*Id.* at pp. 27-28.) In January 2010, Dynegy filed a motion for summary judgment challenging Multiut's fraud and Illinois Consumer Fraud and Deceptive Trade Practices Act claims. (*Id.* at p. 28.) The motion is fully briefed and awaiting a decision. (*Id.*)

In April 2010, the Debtor and Multiut filed a malpractice claim in the District Court for the Northern District of Illinois against Greenberg Traurig, LLP ("Greenberg") based upon its representation of the Debtor and Multiut in the Illinois Litigation and the MDL. (*Id.* at pp. 29-30.) The Debtor contends, among other things, that Greenberg failed to adequately raise defenses to claims asserted in the Illinois Litigation with respect to the Debtor's personal guarantee. (*Id.*) Further, the Debtor alleges that Greenberg failed to preserve the Debtor's ability to participate in the MDL. (*Id.*) The Debtor and Multiut have asserted a claim for damages in excess of $20 million. (*Id.* at p. 30.) This claim against Greenberg is being pursued by counsel on a contingent fee basis. (*Id.*) In December 2010, the District Court granted the Debtor and Multiut leave to file an amended complaint. *Multiut Corp. v. Greenberg Traurig, LLP*, No. 10 C 3238, 2010 WL 5018538, at *5 (N.D. Ill. Dec. 2, 2010). (Dynegy Ex. No. 31.)

On February 22, 2010, Dynegy filed a motion to appoint an examiner. (Docket No. 256.) On March 16, 2010, after a hearing on the motion granted by the Court, the United States Trustee appointed Patrick J. O'Malley (the "Examiner") as examiner of the Debtor's estate. (Docket No.

275.) Thereafter, on July 6, 2010, the Examiner filed a preliminary report with the Court. (Dynegy Ex. No. 9.) The Examiner filed a second report ("Second Report") on December 13, 2010. (Dynegy Ex. No. 35.)

The Examiner found, *inter alia*, that the Debtor's books and records currently available were "less than appropriate for the size and complexity of the Debtor's various businesses." (*Id.*) Further, the Examiner noted discrepancies between the Debtor's records and his bankruptcy schedules and statement of financial affairs. (*Id.*) The Examiner also discovered variances between the Debtor's 2008 income tax return and other information he reviewed. (*Id.*)

On November 11, 2009, Dynegy filed its proof of claim against the Debtor in the sum of $22,750,716.54. (Dynegy Ex. No. 6.) The Debtor filed an objection to that claim. (Docket No. 315.) On August 16, 2010, the Court overruled the Debtor's objection to Dynegy's claim because it had already been adjudicated on the merits by the District Court in Dynegy's favor. (Docket No. 374.)

On September 3, 2010, the Debtor filed his fourth amended disclosure statement ("Disclosure Statement") as well as the Plan. (Debtor Ex. Nos. 5 & 6.)[2] On October 7, 2010, the Court approved this iteration of the Disclosure Statement as adequate under 11 U.S.C. § 1125. (Debtor Ex. No. 7.) The Plan proposes to pay administrative claims and priority tax claims, and it defines twelve different classes of claims. Seven of the twelve classes are for secured claims. Two of the five remaining classes are single-person classes. Class 7 is the claim of Sam Lipshitz ("Lipshitz"), the Debtor's friend and business partner. Class 9 is the claim of Bruria Draiman,

---

[2] Dynegy also submitted copies of the Disclosure Statement and Plan as exhibits. (Dynegy Ex. Nos. 7 & 8.) For ease of reference, the Court will only refer to the Debtor's exhibits.

the Debtor's ex-wife ("Bruria"). Class 12 creditors are defined as insiders, friends, and business partners of the Debtor. Class 10 consists of general unsecured claims. Class 11 consists of four claims that the Debtor has defined as unsecured and disputed. Dynegy's claim has been placed in Class 11.

The Disclosure Statement provides that the Debtor's assets shall be divided into three groups: (1) the "Retained Assets"[3] that will be purchased and retained by the Debtor; (2) Future Associates Assets[4] that will be purchased and transferred to a new entity formed by the Debtor; and (3) Liquidation Trust Assets[5] that will be transferred to a liquidation trust (the "Liquidation Trust"), which will be set up for this purpose, in order to liquidate the Debtor's remaining non-exempt assets for the benefit of his creditors. (Debtor Ex. No. 6 at p. 4.) Distributions for claims provided for in the Plan shall be made by a liquidation trustee (the "Liquidation Trustee"). (*See id.* at p. 23.) These distributions will be funded by the sale of assets transferred to the Liquidation Trust and from payments made by the Debtor on a note he will execute. (*Id.*)

Dynegy filed objections to the Plan and the Court set an evidentiary hearing. A trial was held on December 13, 14, and 16, 2010, to consider confirmation of the Plan and the objections

---

[3] The Plan defines "Retained Assets" to include the Debtor's residence, cars, household goods, interests in IRA accounts, liquidated debts due from Yehuda Draiman, a residual interest in the estate of Samuel Draiman, and other tangible personal property. (Debtor Ex. No. 5 § 1.1.48; Trans. 33:15 - 22.)

[4] Future Associates Assets consist mainly of furniture and fixtures, but, also include contract rights under management contracts Future Associates has entered into with third parties. (Debtor Ex. No. 5 § 1.1.30; Trans. 32:13 - 15.)

[5] This term will be defined *infra* in § IV.A.8 of this Opinion.

thereto. Based upon the testimony and evidence presented to the Court at the confirmation hearing, the Court makes the following findings of fact and conclusions of law.

## III. APPLICABLE STANDARDS

Section 1129 of the Bankruptcy Code sets forth the substantive requirements for confirmation of a Chapter 11 plan. In order to be confirmed, a plan must satisfy §§ 1129(a)(1)-(16). *See In re 203 N. LaSalle St. P'ship*, 126 F.3d 955, 960 (7th Cir. 1997), *rev'd on other grounds*, 526 U.S. 434 (1999). A plan that satisfies every part of § 1129(a), except for subsection (a)(8), may be confirmed by "cram down" under § 1129(b) if the plan does not discriminate unfairly between impaired classes and is fair and equitable to the rejecting classes. *Id.* at 961; *In re S. Beach Sec., Inc.*, 376 B.R. 881, 887 n.11 (Bankr. N.D. Ill. 2007); *In re Rusty Jones, Inc.*, 110 B.R. 362, 373 (Bankr. N.D. Ill. 1990).

"The proponent of the plan bears the burden of establishing that each requirement set forth in § 1129(a) has been met." *In re Sentinel Mgmt. Group, Inc.*, 398 B.R. 291, 292 (Bankr N.D. Ill. 2008). *See also In re Vita Corp.*, 358 B.R. 749, 750 (Bankr. C.D. Ill. 2007), *aff'd*, 380 B.R. 525 (C.D. Ill. 2008). The proponent must meet its burden by a preponderance of the evidence. *S. Beach Sec.*, 376 B.R. at 887; *In re Repurchase Corp.*, 332 B.R. 336, 342 (Bankr. N.D. Ill. 2005), *aff'd*, No. 05 C 7075, 2008 WL 4379035 (N.D. Ill. Mar. 24, 2008); *Rusty Jones*, 110 B.R. at 373. Even absent the filing of an objection to a plan, the proponent must affirmatively demonstrate that the plan is confirmable. *Rusty Jones*, 110 B.R. at 373. Additionally, regardless of whether an objection to confirmation has been raised, the court must determine whether the requirements of § 1129(a), and if applicable § 1129(b), have been met. *Sentinel*, 398 B.R. at 292;

*Vita Corp.*, 358 B.R. at 750; *Rusty Jones*, 110 B.R. at 373. The Court will focus the discussion in the matter at bar on those confirmation requirements that are disputed by the parties. All the other requirements of § 1129(a) have either been met or are inapplicable to the facts in this case and, accordingly, will not be discussed further.

## IV. DISCUSSION

### A. Section 1129(a) Objections to the Plan

#### 1. Section 1129(a)(1)

Section 1129(a)(1) mandates that "[t]he plan compl[y] with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1). The Code does not define the phrase "applicable provisions," however, it is aimed at compliance with 11 U.S.C. §§ 1122 and 1123. *In re S. & W. Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984). The legislative history for this section states that "[p]aragraph (1) requires that the plan comply with the applicable provisions of Chapter 11, such as section 1122 and 1123, governing classification and contents of a plan." H.R.REP. NO. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 6368; S.REP. NO. 95-989, at 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5912.

##### i. Section 1122(a)

Dynegy asserts that the Plan improperly classifies its claim in violation of 11 U.S.C. § 1122. Section 1122(a) provides as follows:

> (a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

11 U.S.C. § 1122.

"Every plan proponent creates its classification scheme with the goal of maximizing the probability that its plan will be confirmed." *In re Bloomingdale Partners*, 170 B.R. 984, 996 (Bankr. N.D. Ill. 1994). A plan proponent has broad discretion in classifying claims. *Id.* at 997. In other words, a debtor "possesses considerable, but not complete, discretion to classify claims and interests in its Chapter 11 plan of reorganization." *In re Woodbrook Assocs.,* 19 F.3d 312, 317 (7th Cir. 1994) (*citing In re Holywell Corp.*, 913 F.2d 873, 880 (11th Cir. 1990)). The improper classification of claims results in denial of confirmation under § 1129(a)(1). *See S. & W. Enter.,* 37 B.R. at 158 (discussing § 1122(b) and the classification of unsecured claims).

Section 1122(a) "does not expressly require that all substantially similar claims be placed in the same class, nor does it expressly prohibit substantially similar claims from being classified separately." *In re SM 104 Ltd.,* 160 B.R. 202, 216 (Bankr. S.D. Fla. 1993). Section 1122(a) permits classification of claims and interests subject to the restriction that a claim or interest be included in a certain class only if it is "substantially similar" to other claims and interests in that class. *Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship,* 248 B.R. 668, 691 (D. Mass. 2000). Hence, pursuant to its express language, § 1122(a) requires only that dissimilar claims not be classified together. *See In re Dow Corning Corp.,* 280 F.3d 648, 661 (6th Cir. 2002). The Code is silent on how to ascertain whether claims are "substantially similar." *Bloomingdale Partners,* 170 B.R.

at 989. Indeed, § 1122 "provides little guidance as to how claims are to be classified." *In re Nat'l/Northway Ltd. P'ship,* 279 B.R. 17, 25 (Bankr. D. Mass. 2002).

The Seventh Circuit Court of Appeals addressed the classification of claims in the Chapter 11 context and stated as follows:

> A debtor in bankruptcy has considerable discretion to classify claims and interests in a chapter 11 reorganization plan. While a debtor may not separately classify claims solely in order to gerrymander an affirmative vote on reorganization, claims may be classified separately if significant disparities exist between the legal rights of the holder[s of the different claims] which render the two claims not substantially similar. Claims may also be separately classified if there are good business reasons to do so or if the claimants have sufficiently different interests in the plan.

*In re Wabash Valley Power Ass'n, Inc.*, 72 F.3d 1305, 1321 (7th Cir. 1995) (internal quotations omitted). That being said, it has also been noted that "[s]ome limits are necessary to offset a debtor's incentive to manipulate a classification scheme and ensure the affirmative vote of at least one impaired class . . . ." *Woodbrook,* 19 F.3d at 317 (citations omitted). The Seventh Circuit has not defined those limits.

While many tests have been adopted by other courts, the Seventh Circuit has not endorsed a test. Rather, the Seventh Circuit has opined "that this is one of those areas of the law in which it is not possible to do better than to instruct the first-line decision maker, the bankruptcy judge, to seek a result that is reasonable in light of the purposes of the relevant law . . . ." *In re Crawford*, 324 F.3d 539, 542 (7th Cir. 2003) (determining the legitimacy of proposed classifications of claims in the Chapter 13 context). The *Crawford* case provides guidance to the Court in the matter at bar. *See In re Quay Corp.*, 372 B.R. 378, 385 (Bankr. N.D. Ill. 2007)

("Opinions construing classification under a plan proposed pursuant to Chapter 13, § 1322(b)(1) may be seen to provide guidance in cases under § 1122(a) of Chapter 11.").

The question then turns to how a court should determine whether claims are "substantially similar." "Similarity is not a precise relationship, and the elements by which we judge similarity or resemblance shift[] from time to time in bankruptcy." *Woodbrook*, 19 F.3d at 318. Lacking a specific test or definition from the Seventh Circuit, the Court turns to other circuits. The Ninth Circuit postulated that the bankruptcy court must evaluate "the nature of each claim, i.e., the kind, species, or character of each category of claims." *In re Johnston*, 21 F.3d 323, 327 (9th Cir. 1994). This determination should focus on the nature or legal attributes of the claims and not on the status or circumstances of the claimants. *In re Coram Healthcare Corp.*, 315 B.R. 321, 349 (Bankr. D. Del. 2004); *see also In re Dow Corning Corp.*, 244 B.R. 634, 644 (Bankr. E.D. Mich. 1999) (defining "substantially similar" as "similar in legal nature, character or effect"), *aff'd*, 255 B.R. 445 (E.D. Mich. 2000); *In re Frascella Enters., Inc.*, 360 B.R. 435, 442 (Bankr. E.D. Pa. 2007) ("The similarity of claims is not judged by comparing creditor claims *inter se*. Rather, the question is whether the claims in a class have the same or similar legal status in relation to the assets of the debtor.").

"In other words, the emphasis is not upon the holder of the claim so much as it is upon what type of claim the holder has against the estate." *Sentinel*, 398 B.R. at 298 (*citing Coram Healthcare*, 315 B.R. at 349). "Section 1122(a) does not require 'absolute homogeneity' of all claims or interest[s]." *In re Simplot*, No. 06-00002-TLM, 2007 WL 2479664, at *14 (Bankr. D. Idaho Aug. 28, 2007). Moreover, claims are not required to be classified based on their value. *In re Resorts Int'l, Inc.*, 145 B.R. 412, 448 (Bankr. D.N.J. 1990).

Dynegy argues that the Plan improperly attempts to "gerrymander" its claim in order to obtain a consenting impaired class. Dynegy maintains that rather than be placed with other unsecured creditors whose claims have been allowed, it has been placed in a class with the disputed claims of other unrelated entities. If, however, Dynegy had been placed in the class of general unsecured claims, that class would not have approved the Plan and the Debtor may not have had a consenting impaired class. According to Dynegy, the Debtor has no legitimate reason to place it into a separate class from other general unsecured creditors because Dynegy's claim has already been allowed by this Court.

Class 10 consists of allowed general unsecured claims against the estate which are liquidated and not subject to setoff. (Debtor Ex. No. 6 at p. 19.) Dynegy was placed in Class 11 along with Great Western Life Insurance and Annuity Insurance Company, Greenberg, and Jerusalem Enterprises, Inc. (*Id.* at pp. 19-20; Trans. 27:3 - 5.) The Debtor testified that the Plan classifies these claims separately for two reasons: the Debtor is involved in litigation with these entities and the Debtor has counterclaims against each entity. (Trans. 27:7 - 9.) Furthermore, if the Debtor is successful in litigation against any of the Class 11 claimants, any recovery would benefit general unsecured creditors. (*Id.* at 30:20 - 24; 38:8 - 41:12.)

Dynegy asserts that because it has an allowed general unsecured claim it should have been placed in Class 10 with other general unsecured claimants. The fact that Dynegy's claim has been allowed is not dispositive on the issue of whether Dynegy's claim was improperly classified. The important inquiry is whether the Debtor has good business reasons for placing Dynegy in Class 11.

Dynegy focuses on the fact that Multiut's claim was placed in Class 10 even though the Debtor has a substantial setoff claim against Multiut. Following Dynegy's argument to its logical conclusion, Multiut should have been placed with other claimants against whom the Debtor had a right of setoff. If that were the case, Class 10 would still have accepted.

Regardless, the Plan as drafted by the Debtor still meets the requirements of § 1122. The Debtor is afforded broad discretion in classifying claims and his explanation that the Class 11 claimants were classified separately because he is involved in litigation with each of these entities and has counterclaims against them shows that the Class 11 creditors have substantially similar claims and sufficiently different interests from the Class 10 creditors.[6] That the Debtor is currently engaged in litigation with the Class 11 claimants is a good business reason for their separate classification. The Court finds that the Plan does not improperly classify Dynegy's claim in violation of § 1122.

**ii. Section 1123(a)(4)**

To be confirmed, a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest[.]" 11 U.S.C. § 1123(a)(4). The text of § 1123(a)(4) mandates that a confirmable plan provide the "same treatment" for class members. The United States Supreme Court and the United States Court of Appeals for the Seventh Circuit have consistently instructed lower courts to accord statutory terms or words their ordinary, common

---

[6] Dynegy states "[i]t is obvious that Debtor's only purpose in placing Dynegy in Class 11 is to improperly gerrymander Dynegy into a class apart from other unsecured Class 10 creditors in order to obtain an impaired consenting class for his Plan." (Dynegy Memo. at p. 12.) Though it may be obvious to Dynegy, it is not obvious to this Court.

meaning unless they are specifically defined by the statute or the statutory context requires a different definition. *See, e.g.*, *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 207 (1997); *Precision Indus., Inc. v. Qualitech Steel SBQ, LLC*, 327 F.3d 537, 544 (7th Cir. 2003). "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what is says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (internal quotations and citations omitted).

However, bankruptcy courts have some discretion in deciding whether class members are receiving the same treatment. Section 1123(a)(4) does not require precise equality, only approximate equality. *In re Dow Corning Corp.*, 255 B.R. 445, 497 (E.D. Mich. 2000), *aff'd in part and remanded in part*, 280 F.3d 648 (6th Cir. 2002). The "same treatment" does not mean "identical treatment" and other circuits have "approved settlements where the class members received different percentages of recovery to take into account different factors so long as the settlement terms are rationally based on legitimate consideration[s]." *In re Hibbard Brown & Co.*, 217 B.R. 41, 47 (Bankr. S.D.N.Y. 1998).

Section 1123(a)(4) "does not require that claims legitimately classified in separate classes receive the same treatment. Whether it is appropriate for a proposed plan to provide different treatment to claims which are legitimately classified in separate classes will arise, if at all, in the context of cramdown." *Dow Corning*, 244 B.R. at 666.

**a. Treatment of Dynegy**

The Plan provides that the Debtor:

> shall continue to dispute the claims of the Class 11 Creditors. In the event that Debtor is not successful in contesting the Claim of any Class 11 Creditor, the Claim of the Class 11 Creditor shall be paid in the same manner as the Class 10 Claims. In the event that the Liquidation Trustee disburses funds to Class 10 Creditors before the final resolution of the Class 11 Claims, a reserve shall be established by the Liquidation Trustee to ensure that there are sufficient funds available to pay the unresolved Class 11 Claims.

(Debtor Ex. No. 5 § 4.11.) In essence, the Plan proposes to delay payment to Dynegy and all other Class 11 creditors until their respective litigations have been finally resolved. In his reply, the Debtor claims that "Dynegy's argument that it is being forced to wait for payment is simply wrong and cannot be the basis for denial of confirmation." (Debtor Reply at p. 7.) The Debtor bases this argument on the fact that Dynegy has an allowed claim and the Plan dictates that if the Debtor is unsuccessful in contesting a Class 11 claim, that claim will be paid in the same manner as Class 10 claims. This argument marks the first time that the Debtor has taken this position. At trial, the Debtor testified that Dynegy's payment would be delayed until resolution of its claim. (Trans. 23:12 - 24; 70:25 - 71:4; 115:11 - 17; 397:3 - 398:6.) This is in direct contradiction to the Debtor's argument in his reply. The Plan provides that the Debtor shall continue to dispute the claims of the Class 11 creditors, of which Dynegy is one. The Debtor is currently engaged in litigation with Dynegy in the Seventh Circuit, appealing Dynegy's judgment. Until such time as the Debtor has exhausted all appeals with respect to Dynegy's judgment, the Plan does not require Dynegy to be paid, but instead requires the funds to be held in a reserve. (Debtor Ex. No. 5 § 4.11.) Thus, the Debtor's statement that Dynegy must be paid in the same manner as Class 10

claims is inaccurate because Dynegy's judgment is still being disputed under the Plan and is not entitled to be paid until such litigation is resolved.

Dynegy asserts that it is entitled to receive the value of its claim now and that the Debtor must either pay interest to Dynegy while its distribution is being reserved or value its claim as of the distribution date. While this argument may have merit under § 1129(b), it is misplaced with respect to § 1123(a)(4). *See Dow Corning*, 244 B.R. at 666. The fact that Dynegy's distribution will be delayed does not in and of itself constitute unequal treatment. *See In re New Power Co.*, 438 F.3d 1113, 1122-23 (11th Cir. 2006). In fact, the Plan proposes that the payment of all Class 11 creditors' claims will be delayed and, as such, Dynegy's treatment under the Plan is consistent with its class members.

Dynegy's argument appears to hinge on its § 1122 argument that it should have been placed in Class 10 and treated the same as the general allowed unsecured creditors. However, as noted in *Dow Corning*, § 1123(a)(4) does not require the same treatment as between each class, but only among those claimants in the same class. Thus, the Court finds the Plan provides uniform treatment to Class 11 creditors. Dynegy's argument regarding the treatment of its claim fails under § 1123(a)(4).

**b. Treatment of Insiders**

Dynegy argues that the Plan proposes "vastly preferential treatment" to Bruria and Lipshitz. (Dynegy Memo. at p. 13.) The Plan classifies the claims of Bruria and Lipshitz in Class 9 and Class 7, respectively, separate and apart from the claims of other creditors. (Debtor Ex. No. 5 §§ 2.1.7 & 2.1.9.) In addition to other claims, Bruria and Lipshitz have general unsecured claims to be paid in the same manner as the Class 10 creditors' claims. (*Id.* at §§ 4.7 & 4.9.)

Dynegy's argument primarily attacks the basis of Bruria and Lipshitz's claims in support of its argument that Bruria and Lipshitz are preferred claimants. For example, Dynegy points out that the Debtor admitted in the Disclosure Statement that he has made payments to Bruria, but does not know how much he has paid or how those payments were allocated. (Dynegy Memo. at p. 15; Debtor Ex. No. 6 at p. 17.) As to the Lipshitz claim, Dynegy argues that there is no basis for allowing a secured claim of $1,750,000 and no evidence showing that the Debtor is required to maintain a life insurance policy to secure the debt. The arguments with respect to the validity of the claims of Bruria and Lipshitz will not be considered by the Court within the context of this Opinion as they are best addressed as objections to those claims filed by Dynegy and are reserved for the claims allowance process. (Docket Nos. 426 & 428.) Moreover, Dynegy's argument is inapplicable under § 1123(a)(4) because Bruria and Lipshitz have been placed in their own classes and cannot be said to have been treated differently from any other creditors in their classes.

**iii. Section 1123(a)(5)**

Dynegy argues that the Plan does not meet the requirements of 11 U.S.C. § 1123(a)(5), which requires that a plan "provide adequate means for the plan's implementation[.]" Dynegy lists three reasons in support of its argument: (1) the Plan does not transfer the estate's litigation claims to the Liquidation Trust because the claims are not adequately disclosed; (2) the Debtor does not provide adequate means to assure the high levels of income he projects; and (3) the Plan does not provide means to assure that the Liquidation Trust will have adequate funds to pursue the litigation claims it might receive.

As to the transfer of the litigation claims, Dynegy makes further arguments on this point under § 541(a) and § 521. (Dynegy Memo. at pp. 18-21 & 26.) These arguments are best

considered not under any sections cited by Dynegy, but under § 1123(b)(3) which states that a plan may provide for the retention and enforcement of any claims or interests of the debtor. *See In re Kmart Corp.*, 310 B.R. 107, 120 (Bankr. N.D. Ill. 2004) ("Although section 1123(b)(3) is not an express disclosure or notice statute, it has been viewed by some courts as serving a disclosure and notice function. The debtor . . . is in effect disclosing and giving notice of its intent to reserve estate claims for post-confirmation enforcement.") (citation omitted). Therefore, the Court will address this argument separately under § 1123(b)(3).

Dynegy next argues that the Debtor fails to assure "that he will continue to have the benefit of the management contracts that currently provide hundreds of thousands of dollars of annual income . . . ." (*Id.* at p. 17.) This argument fails for two reasons. One, the Debtor's ability to generate income is best addressed under the feasibility requirement of § 1129(a)(11). Two, Dynegy seemingly attempts to create a higher standard for the Debtor to meet by stating that the Debtor should have "a plan in place to replace these contracts and their income if the contracts are terminated . . . ." (*Id.*) Section 1123(a)(5) requires only an "adequate means" for the Plan's implementation, it does not require the Debtor to provide an alternate means of generating income.

Finally, Dynegy contends that the Plan does not provide any means to assure that the Liquidation Trust will have adequate funds to pursue litigation claims purportedly transferred to it by the Plan. Neither the Plan nor the Disclosure Statement appears to estimate or even mention the potential costs to be incurred by the Liquidation Trustee in pursuing future litigation claims. The Debtor testified that with respect to the Illinois Litigation and the MDL he would be willing

to fund the litigation if Multiut and/or the Liquidation Trustee were unable to do so.[7] (Trans. 64:23 - 65:8; 360:3 - 8.) The Debtor limited his testimony to the Seventh Circuit litigation against Dynegy and did not testify that he would be willing to fund the litigation of other claims transferred to the Liquidation Trust. Those costs would primarily relate to claims against the persons and entities listed on Exhibit J to the Disclosure Statement.

Dynegy's argument fails. Dynegy does not take into account the $100,000 to be paid for the Retained Assets and Future Associates Assets. That $100,000 will serve as starting capital for the Liquidation Trustee to pursue avoidance actions and to liquidate the Liquidation Trust Assets. For these reasons, the Court overrules Dynegy's objections under § 1123(a)(5).

**iv. Section 1123(b)(3)**

As discussed above, Dynegy argues that the Plan fails to transfer the estate's litigation claims to the Liquidation Trust because those claims are not adequately disclosed in the Plan. Although Dynegy makes arguments under §§ 1123(a)(5), 541(a), and 521, those points are best discussed under § 1123(b)(3) and Dynegy's arguments on this issue are consolidated for the purposes of this section.

In *D & K Properties Crystal Lake v. Mutual Life Insurance Co. of New York*, 112 F.3d 257, 261 (7th Cir. 1997), the Seventh Circuit held that in order to avoid the res judicata effect of a Chapter 11 plan confirmation order, a plan's reservation of a cause of action must be express–in writing and specifically identified. The plan at issue in *D & K Properties* purported to reserve on behalf of the estate "all causes of action existing in favor of the Debtor and the Debtor in

---

[7] The Court acknowledges that the Debtor's estate is not responsible for the litigation costs of the MDL.

Possession." *Id.* at 259. The court explained that because D & K failed to identify any claim it was reserving, its cause of action was barred. *Id.* at 261. In so holding, the Seventh Circuit explained that "[a] blanket reservation that seeks to reserve all causes of action reserves nothing. To hold otherwise would eviscerate the finality of a bankruptcy plan containing such a reservation, a result at odds with the very purpose of a confirmed bankruptcy plan." *Id.*

The Debtor argues that the very next year, the Seventh Circuit rejected *D & K Properties* stating that a claim need not be "specific and unequivocal" as the "statute itself contains no such requirement." *P.A. Bergner & Co. v. Bank One Milwaukee, N.A. (In re P.A. Bergner & Co.)*, 140 F.3d 1111, 1117 (7th Cir. 1998). *Bergner* did not reject *D & K Properties*, as the Debtor asserts, but rather supplements that decision.[8] *See Kmart*, 310 B.R. at 124 n.8 (stating that the cases should be read together). That court explained as follows:

> While there might be some logic in requiring "specific and unequivocal" language to preserve claims belonging to the estate that have never been raised, the statute itself contains no such requirement. The courts that have spoken of the need for "specific" and "unequivocal" language have focused on the requirement that plans unequivocally retain claims of a given type, not any rule that individual claims must be listed specifically.

*Bergner*, 140 F.3d at 1117.

"*Bergner* stands for the proposition that plan provisions identifying causes of action by type or category are not mere blanket reservations. Therefore, categorical reservation can

---

[8] In *CLC Creditors' Grantor Trust v. Sonnenschein Nath & Rosenthal LLP (In re Commercial Loan Corp.)*, 363 B.R. 559 (Bankr. N.D. Ill. 2007), Judge Goldgar provides a detailed analysis of the many approaches of courts on the issue of what constitutes an effective reservation of claims in a Chapter 11 plan. *Id.* at 567-569.

effectively avoid the *res judicata* bar." *Kmart*, 310 B.R. at 124. Claims need not be catalogued by name. *Id.*

The Plan provides for the transfer to the Liquidation Trust of all causes of action and claims that belong to the Debtor, including "Avoidance Actions." This term is defined as:

> any and all lawsuits, actions or claims, that could have been brought, or have been brought, to recover, set aside, invalidate or subordinate a transfer of, or claim against, property in which the Debtor had or has an interest, the Debtor's Assets or Estate, and includes, without limitation, proceedings brought under Bankruptcy Code §§ 542, 543, 544, 545, 547, 548, 549, 550 and/or 553.

(Debtor Ex. No. 5 §§ 1.1.4, 1.1.12, & 6.2.2.) The Plan reserves and transfers lawsuits, actions, and claims categorically, listing each applicable Code section. In addition, the Debtor attached to the Plan and the Disclosure Statement a list of persons or entities who may be subject to those avoidance actions. (*Id.*, Ex. B; Debtor Ex. No. 6, Ex. J; Debtor Ex. No. 19.) The reservation in the Plan is both express and unequivocal because it lists specific Code sections under which the Liquidation Trustee can pursue claims or causes of action and it names the persons or entities who may have received such transfers. Together, these provide the requisite notice under § 1123(b)(3).[9]

---

[9] Despite the Debtor's failure to adequately preserve any potential claims, such as any claims against insiders like Draiman and Future Associates, Dynegy does not cite any case or statutory provision which provides that this failure constitutes a basis for denial of confirmation, nor has the Court's research revealed any such case. Section 1123(b)(3) merely states that a plan "may" provide for the retention of claim. 11 U.S.C. § 1123(b)(3). Nothing in that section can be construed as a mandate. Similarly, nothing in § 541(a), cited by Dynegy, serves as a basis for denial of confirmation. Therefore, the Court is unwilling to hold that a failure to preserve potential claims is alone a basis upon which to deny confirmation.

Based on this Court's reading of *Bergner* and *Kmart*, the Court overrules Dynegy's objection, finding that the categorical reservation and transfer of the lawsuits, actions, and claims as well as the attached exhibits are sufficient to avoid the res judicata bar effect of confirmation.

**v. Improper Release**

Dynegy argues that the Plan improperly releases certain parties in that the release is overly broad. The Seventh Circuit has held that the bankruptcy court may "release third parties from liability to participating creditors if the release is 'appropriate' and not inconsistent with any provision of the [B]ankruptcy [C]ode." *Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns, Inc.)*, 519 F.3d 640, 657 (7th Cir. 2008). *See also In re Ingersoll Inc.*, 562 F.3d 856, 864 (7th Cir. 2009). Whether the release is "appropriate" is fact intensive and depends on the nature of the reorganization. *Airadigm*, 519 F.3d at 657. The release must be narrow in that it applies only to claims "arising out of or in connection with" the reorganization and does not include "willful misconduct." *Id.* (internal quotation omitted). Moreover, the release may not provide for "blanket immunity." *Id.* The immunity afforded by the release must not affect matters beyond the jurisdiction of the court or unrelated to the reorganization. *Id.* "A nondebtor release should only be approved in 'rare cases' . . . because it is 'a device that lends itself to abuse.'" *Ingersoll*, 562 F.3d at 865 (*quoting In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141, 142 (2d Cir. 2005)). The justification for granting third-party releases in a plan of liquidation is far less compelling than in a plan of reorganization. *In re Berwick Black Cattle Co.*, 394 B.R. 448, 461 (Bankr. C.D. Ill. 2008).

The Plan proposes to grant releases to "Liquidation Trust Parties." The Plan defines Liquidation Trust Parties as "the Liquidation Trustee, the Debtor, and their respective officers,

directors, shareholders, employees, consultants, agents, advisors, attorneys, accountants, financial advisors, and other representatives and Professionals."[10] (Debtor Ex. No. 5 § 1.1.34.)

Section 8.3 of the Liquidation Trust Agreement sets forth the liability of the Liquidation Trust Parties. In relevant part, that section provides as follows:

> 8.3.1. Limitations on Liability. No provision of this Agreement shall be construed to impart any liability upon any of the Liquidation Trust Parties unless it shall be determined by a Final Order of the Court that such individual's actions or omissions constituted willful misconduct or fraud in the exercise of or failure to exercise any right or power vested in the Liquidation Trustee under this Agreement.
>
> 8.3.2 Liability of Liquidation Trust Parties. In no event shall any of the Liquidation Trust Parties be held personally liable for any claim asserted against one or more of the Liquidation Trust Parties or the Liquidation Trust, except for actions or omissions to act, to the extent such actions or omissions to act are determined by a Final Order of the Court, to be due to such individuals own respective willful misconduct or fraud after the Effective Date. It shall be an irrebuttable presumption that any action taken or omitted to be taken with the approval of the Court shall not constitute willful misconduct or fraud.
>
> . . .
>
> 8.4.1. Exculpation and Indemnification. All of the Liquidation Trust Parties shall be and hereby are exculpated by all Persons, including, without limitation, holders of Claims and other parties-in-interest, of and from any and all claims, causes of action and other assertions of liability arising out of ownership of the Trust Assets and the discharge of the powers and duties conferred upon the Liquidation Trust Parties through the Plan, the Confirmation Order, this Agreement, any order of the Court entered pursuant to or in furtherance of the Plan or this Agreement, or applicable law or otherwise, other than actions or omissions to act to the extent

[10] Professional is defined by the Plan as "any person or entity retained or entitled to be compensated pursuant to sections 326, 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code[.]" (Debtor Ex. No. 5 § 1.1.44.)

> determined by a Final Order of the Court to be due to the individual Liquidation Trust Party's own respective willful misconduct or fraud after the Effective Date. No holder of a Claim or other party-in-interest will have or be permitted to pursue any claim or cause of action against any Liquidation Trust Party for making payments in accordance with the Plan, the Confirmation Order, this Agreement or any order of the Court, or for implementing the provisions of the Plan, the Confirmation Order, this Agreement or any order of the Court . . . .

(*Id.* Ex. A.)

Dynegy makes two arguments in support of its objection to the release language. First, Dynegy argues that the Liquidation Trust Parties are released from all but the most egregious conduct. Second, it argues that the definition of "Liquidation Trust Parties" is overbroad.

The Liquidation Trust Agreement only holds the Liquidation Trust Parties responsible for willful misconduct or fraud.[11] Like *Airadigm*, the language of the release does not protect the Liquidation Trust Parties from their willful misconduct. Thus, the release cannot be construed as blanket immunity for all transgressions and omissions. It remains to be determined, however, whether the release of the Liquidation Trust Parties is necessary or sufficiently narrow.

The language in the Plan that defines the Liquidation Trust Parties includes not only the Liquidation Trustee and the Debtor, but "their respective officers, directors, shareholders, [and] employees . . . ." (*Id.* at § 1.1.34.) First, it is unclear to the Court who would be considered officers, directors, or shareholders of either the Liquidation Trustee or the Debtor. Both the

---

[11] In Dynegy's Memorandum and the Debtor's Reply, they quote the Liquidation Trust Agreement as releasing the Liquidation Trust Parties from "breach of fiduciary duty, willful misconduct or fraud." (Dynegy Memo. at p. 32; Debtor Reply at p. 15.) However, the Liquidation Trust Agreement, which was submitted by both Dynegy and the Debtor as trial exhibits (Dynegy Ex. No. 8; Debtor Ex. No. 5), does not include the language "breach of fiduciary duty." Thus, both Dynegy and the Debtor misquote the exhibits.

Liquidation Trustee and the Debtor are individuals and, therefore, neither would nor could have officers, directors, or shareholders. While the Debtor acknowledges that he does not have any officers, directors, or shareholders, he fails to address the larger issue of "employees."

The term "employees" is vastly encompassing and could potentially include any number of insiders with whom he is engaged in multiple ventures, such as those the Debtor lists in Exhibit 19. Dynegy argues that insiders could potentially be released from all claims the estate has against them, including any avoidance actions. The Court, however, does not read the language of the release provisions in that way. Rather, the plain language of the Liquidation Trust Agreement releases the Liquidation Trust Parties only from claims arising out of ownership of Trust Assets and the discharge of their duties with respect to those Trust Assets.

Nevertheless, the Debtor has failed to demonstrate why it is necessary to release such a wide spectrum of individuals and/or entities who may or may not be critical to the success of the Liquidation Trust. Furthermore, because this Plan is a partial liquidation and not wholly a reorganization, the justification for the release is far less compelling. *See Berwick*, 394 B.R. at 461.

The Court finds that the release provisions in the Liquidation Trust Agreement are not appropriately narrowly tailored because the definition of "Liquidation Trust Parties" is overly extensive and there is no evidence that the provisions are critical to the Plan. Hence, the Court sustains Dynegy's objection to the Plan on this point.

**2. Section 1129(a)(2)**

A plan proponent must comply with the applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(2). The legislative history of this section indicates that Congress was

concerned "that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure." H.R. REP. NO. 95-695, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 6368; S. REP. NO. 95-989, at 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5912. Additionally, § 1129(a)(2) mandates compliance with court orders issued in furtherance of the reorganization process. *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 236 (Bankr. D.N.J. 2000).

Some courts have strictly construed § 1129(a)(2), and denied confirmation for any violation of the Code. *Id.* at 236-37 (collecting cases). Other courts have taken a less draconian approach:

> Congress did not intend to fashion a minefield out of the provisions of the Bankruptcy Code. In fact, the legislative history mentions the provision only in passing, offering as an example of compliance that the debtor meet the disclosure requirements of § 1125 to satisfy § 1129(a)(2). Certainly, if Congress had meant that *any* infraction, no matter how early on in the case, no matter how minor the breach, and regardless of whether the court has remedied the violations, should result in a denial of confirmation, Congress would have given some clearer indication in the legislative history or made the statutory provision far more express.

*In re Landing Assocs., Ltd.*, 157 B.R. 791, 811 (Bankr. W.D. Tex. 1993) (citation omitted). "Nonetheless, 'serious violations of the Bankruptcy Code by a [proponent] can and should result in a denial of confirmation of a plan under § 1129(a)(2).'" *Great Bay Hotel & Casino*, 251 B.R. at 237 (*quoting Landing Assocs.*, 157 B.R. at 810).

**i. Sections 727(a)(3) and (a)(5)**

Dynegy objects to confirmation of the Plan on the basis that the Debtor has failed to comply with all of the provisions of the Code. Specifically, Dynegy argues that the Debtor failed

to maintain adequate books and records as required by 11 U.S.C. § 727(a)(3)[12] and that he failed to satisfactorily explain any loss or deficiency of assets pursuant to 11 U.S.C. § 727(a)(5).

The Court rejects Dynegy's argument because § 727(a) does not apply to Chapter 11 cases. The Code provides that "[s]ubchapters I and II of chapter 7 of this title apply *only* in a case under such chapter." 11 U.S.C. § 103(b) (emphasis added). Section 727 is part of subchapter II, and thus, applies only in Chapter 7 cases. *Wachovia Sec., LLC v. Jahelka (In re Jahelka)*, 442 B.R. 663, 672-73 (Bankr. N.D. Ill. 2010); *Kelly v. Giguere (In re Giguere)*, 165 B.R. 531, 534 (Bankr. D.R.I. 1994); *Reynolds v. Miller (In re Miller)*, 80 B.R. 270, 270 (Bankr. W.D.N.Y. 1987). *See also United States Tr. v. Stone (In re Stone)*, Nos. 09-3072, 09-32346, 2009 WL 3459863, at *4 (Bankr. N.D. Ohio Oct. 6, 2009) (stating that "the provisions of Chapters 7, 12 and 13 have application only to cases filed under their respective chapters"); *E. Wrecker Sales, Inc. v. Parker (In re Parker)*, 49 B.R. 61, 62 (Bankr. E.D. Va. 1985) (noting that the provisions of § 727 do not apply to Chapter 13 cases). Because § 727 is contained within subchapter II of Chapter 7, § 103(b) limits the use of § 727(a) to Chapter 7 cases, unless a specific section of Chapter 11 states otherwise. *Jahelka*, 442 B.R. at 673; *Williams v. United States (In re Williams)*, 227 B.R. 589, 594 (D.R.I. 1998). Thus, the Court finds that § 727(a) cannot serve as a basis for objection to the

---

[12] Dynegy makes much ado with respect to the findings in the Examiner's reports regarding the state of the Debtor's books and records. (Dynegy Memo. at pp. 23-26.) Because § 727(a)(3) cannot serve as a basis for an objection to the Plan, the Court will not address those reports in this part of the Opinion.

The Court notes that Dynegy filed an adversary proceeding (10 A 00235) against the Debtor objecting to his discharge under § 727(a)(2)(A), (a)(2)(B), (a)(4)(A), (a)(4)(D), (a)(5), (a)(6)(A), and (a)(7), and objecting to the dischargeability of its debt under 11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6). This adversary proceeding remains pending.

Plan under § 1129(a)(2).[13] *See Park View Fed. Sav. & Loan Ass'n v. Rich-Morrow Realty Co. (In re Rich-Morrow Realty Co.)*, 100 B.R. 893, 895 (Bankr. N.D. Ohio 1989) (stating that "standing alone, Section 727 is inapplicable to [a debtor's] Chapter 11 case").

**ii. Failure to File Tax Returns Under 11 U.S.C. § 1112(b)(4)(I)**

Next, Dynegy argues that the Plan violates § 1129(a)(2) because the Debtor failed to file all tax returns in contradiction of 11 U.S.C. § 1112(b)(4)(I). Dynegy asserts that the Debtor not only failed to file his 2009 individual tax return, but a 2009 tax return on behalf of the estate as well. Section 1112(b) provides for the conversion or dismissal of a case, whichever is in the best interests of creditors and the estate, for "cause." 11 U.S.C. § 1112(b)(1). Section 1112(b)(4) sets forth several examples of "cause." One of the enumerated examples is the "failure timely to pay

---

[13] Section 727(a) is mentioned, however, in 11 U.S.C. § 1141(d). Section 1141 provides for the discharge of a debtor's pre-confirmation debts. 11 U.S.C. § 1141(d)(1)(A). This discharge is automatic upon confirmation of the plan, and it applies to all pre-confirmation debts that have not been excepted from discharge. *Williams*, 227 B.R. at 593. There are exceptions found in § 1141(d) to this general discharge. Section 1141(d)(3), one of those exceptions, and the provision that refers to § 727(a), provides as follows:

> The confirmation of a plan does not discharge a debtor if–
> (A) the plan provides for the liquidation of all or substantially all of the property of the estate;
> (B) the debtor does not engage in business after consummation of the plan; and
> (C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.

11 U.S.C. § 1141(d)(3).

Hence, § 727(a) applies in Chapter 11 cases only with respect to the discharge denial provision of § 1141(d)(3). *Jahelka*, 442 B.R. at 673; *Williams*, 227 B.R. at 593-94; *A.M. Mancuso v. Sullivan (In re Sullivan)*, 153 B.R. 746, 750 n.5 (Bankr. N.D. Tex. 1993).

taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief[.]" 11 U.S.C. § 1112(b)(4)(I). First, the Court will address whether the Debtor properly filed a tax return on behalf of the estate for 2009. Then, the Court will address whether the Debtor properly filed his 2009 individual tax return.

The Court rejects Dynegy's argument that the Debtor did not file a separate return for the estate. The Form 1041 that was furnished to the Court was stamped received by the Internal Revenue Service (the "IRS") and signed by the Debtor. (Trans. 192:16 - 19; Debtor Ex. No. 17.) Though Dynegy argues that the Debtor did not allocate income between himself and the estate, page 2 to Exhibit 17 clearly allocates the income.

Under Seventh Circuit law, in order to qualify as a "return" "a document filed with the IRS must (1) purport to be a 'return,' (2) be signed under penalty of perjury, (3) contain enough information to enable the taxpayer's liability to be calculated, and (4) 'evince[ ] an honest and genuine endeavor to satisfy the law.'" *In re Payne*, 431 F.3d 1055, 1057 (7th Cir. 2005) (*quoting Zellerbach Paper Co. v. Helvering*, 293 U.S. 172, 180 (1934)). Based on the following, the Form 1041 satisfies the requirements for a return. Thus, Dynegy's argument as to the Form 1041 fails.

Dynegy acknowledges that the Debtor in fact filed the 2009 tax returns, albeit late.[14] Dynegy fails to make a substantial argument that the late filing in and of itself violates § 1112(b)(4)(I). Instead, the argument focuses on the fact that the late filing prevented the Examiner and creditors from analyzing the 2009 returns with other financial documentation and representations made by the Debtor in the case. Harm to creditors because of the lateness of the

[14] The Debtor obtained an extension from the IRS to file the 2009 tax returns by October 15, 2010. (Trans. 201:20 - 25.) However, the Debtor did not file the 2009 tax returns until December 13, 2010. (*Id.* at 49:25 - 50:6.)

filing is not an element of § 1112(b)(4)(I) and, thus, is not relevant to the Court's inquiry. Moreover, the Court notes that § 1112(b)(4)(I) defines "cause" as either the failure "timely to pay taxes owed" or "to file tax returns due after the date of the order for relief[.]" 11 U.S.C. § 1112(b)(4)(I). The statute does not specifically require timely filing of tax returns, only that they be filed. Therefore, Dynegy's argument as to the timeliness of the filing is rejected.

Dynegy now turns its argument to the validity of the tax returns. It contends that the Debtor's individual tax return is not valid pursuant to IRS regulations because it did not contain a verified signature.[15] The Debtor explained the discrepancy between his full signature on Form 1041 and the "squiggle" on Form 1040, testifying that he thought he signed the Form 1040, but admitting that the "squiggle" looked like no part of his signature. (Trans. 193:1 - 25.)

Dynegy also argues that the Debtor failed to attach W-2s to the tax returns. The Debtor testified that he thought that the return that was filed with the IRS contained W-2s. (*Id.* at 195:12 - 16.) Although he believed the W-2s had been attached to the documents filed with the IRS, the Debtor also testified that Exhibit 17 was a copy of the documents filed with the IRS and that Exhibit 17 did not contain the Debtor's W-2s. (*Id.* at 195:12 - 196:5.) Two days after the

---

[15] The Court received two different copies of the Debtor's and the estate's tax returns. On the first day of trial, December 13, 2010, the Court received an original copy of the estate's Form 1041 and the Debtor's individual Form 1040 which was attached to the Form 1041 for the estate. (Trans. 4:20 - 22.) The face of the Form 1041 was stamped in original ink by the IRS and purportedly signed by the Debtor. The attached Form 1040 contained a "signature" different from the signature on the Form 1041. The signature on the Form 1040 appears to be a small "x." On the second day of trial, the Court received another copy which was labeled "Exhibit 17" and admitted into evidence. The Court notes that the IRS's stamp on the face of the Form 1040 is not original ink and the placement of the stamp is positioned differently. The Debtor's signature on the Form 1041 is different from the signature on the previously submitted Form 1041. The Debtor's signature on Exhibit 17's Form 1040 is markedly different from the previously submitted Form 1040. Instead of an "x" there is a squiggly line, wholly unreadable by the Court.

beginning of trial, the W-2s were furnished to the Court separately as Debtor's Exhibit 17A. Exhibit 17A was not stamped as received by the IRS and is not a part of Exhibit 17 itself. There is insufficient evidence for the Court to find that the W-2s were filed with the Debtor's tax returns.

Nevertheless, the Court must consider whether the failure to attach W-2s to the Debtor's tax returns renders the returns invalid. Page fourteen of the 2009 Instructions for Form 1041 and Schedules A, B, G, J, and K-1 explain that a debtor must attach a copy of the W-2s to the Form 1041.[16] The Debtor did not attach the W-2s and, thus, did not comply with the instructions. However, this is not determinative of whether the Debtor has filed a "return." One requirement of a valid return is that it must contain enough information for the taxpayer's liability to be calculated. *See Payne*, 431 F.3d at 1057. "The omission of a Form W-2 does not prevent the calculation of tax liability." *Blount v. Comm'r of Internal Revenue*, 86 T.C. 383, 387 (1986). *See White v. Comm'r of Internal Revenue*, T.C. Summ. Op. 2002-101, 2002 WL 1825387, at *3 (Aug. 5, 2002) (stating that the failure to attach a W-2 does not prevent the calculation of a taxpayer's liability). The Court finds that the mere failure of the Debtor to attach his W-2s to his tax returns does not render the returns invalid or ineffective.

Dynegy also contends that the Debtor's Form 1040 does not constitute a valid tax return because the Debtor failed to sign it. Failure to sign a tax return under penalty of perjury renders a return invalid. *See Payne*, 431 F.3d at 1057; 26 U.S.C. § 6061(a) (any return, statement, or

---

[16] The Court takes judicial notice of the 2009 IRS Instructions for Form 1041 as it is a publically available document. *See United States v. Wood*, 925 F.2d 1580, 1582 (7th Cir. 1991) (stating that the court may take judicial notice of matters of public record).

other document required to be made under the Internal Revenue Code must be signed in accordance with IRS forms and regulations).

As discussed above, the Debtor testified that the mark on Form 1040 looked like no part of his admitted signature, though he thought that he had signed it. The Court agrees that the mark on the Debtor's Form 1040 looks nothing like his signature on Form 1041 and the Court cannot determine whether such mark was made by the Debtor. As such, the Court finds that the Debtor has not "signed" the Form 1040.

The Court notes that neither Dynegy nor the Debtor has cited any case law to aid the Court in its determination of this issue. The Court's independent research likewise turned up nothing on point. However, many cases acknowledge the doctrine of incorporation by reference with respect to a tax return and hold that false information provided in a schedule which was integral to the return and attached but unsigned can be the basis of a criminal prosecution. *See United States v. Adams*, 314 Fed. Appx. 633, 639-40 (5th Cir. 2009) (schedule which was not integral to the return could not be incorporated by reference into the return and, thus, could not be the basis of a criminal charge for submitting a false return); *United States v. Damon,* 676 F.2d 1060, 1063-64 (5th Cir. 1982) (holding that a false Schedule C is an "integral" part of a tax return and is incorporated therein by reference, thus giving rise to liability under 26 U.S.C. § 7206(1)); *United States v. Taylor,* 574 F.2d 232, 237 (5th Cir. 1978) ("While there is no explicit requirement in the regulations for the completion and filing of Schedules E and F, it is implicit in required Form 1040 that such schedules, when appropriate, become integral parts of such form and are incorporated therein by reference."); *United States v. Sun Myung Moon*, 532 F. Supp. 1360, 1366 (S.D.N.Y. 1982) ("Like the schedules in *Taylor*, a W-2 form or an explanation of its

absence attached to an income tax return becomes part of the return itself. Consequently, any false statement on the form or in the explanation can, if material, form the basis of a prosecution under section 7206(1).").

By analogy, these cases inform and apply to the current situation. In *Taylor* and *Sun Myung Moon*, the court found that statements in attachments to validly filed tax returns could be the basis of criminal sanctions because those attachments were integral and the taxpayer's signature on the tax form could be imputed to the attachments as a basis for liability under the tax code. Because one can be liable for false statements under the tax code for statements in an attachment to a tax form, it can be logically concluded that the statements in an attached but unsigned Form 1040 to a Form 1041 are made under penalty of perjury.

The Debtor signed Form 1041 under penalty of perjury. Form 1040 was a required attachment under the 2009 Instructions and can therefore be considered "integral" to the Form 1041 tax return. On that basis, the Debtor's signature under penalty of perjury on the Form 1041 can be imputed to the Form 1040.

There are at least two cases which have refused to impute a signature to the return itself. In *Vaira v. Comm'r of Internal Revenue*, 52 T.C. 986 (1969), *rev'd on other grounds*, 444 F.2d 770 (1971), the court refused to impute a signature on a check onto a tax return. *Id.* at 1005. In *Fitch v. Comm'r of Internal Revenue*, T.C. Memo. 1975-36, 1975 WL 2677 (Feb. 27, 1975), the court elected not to impute a taxpayer's signature on an accompanying cover letter to the Form 1040. These cases are distinguishable from the previously cited cases and from the case at bar because both *Vaira* and *Fitch* involved signatures on documents that were not tax forms themselves and did not purport to be signed under penalty of perjury.

In the case at bar, the Debtor signed the Form 1041 under penalty of perjury and the Form 1040 was integral to the tax return. Therefore, the Debtor's signature on the Form 1041 can be imputed to the Form 1040. As a result, the Court finds that the Debtor has validly filed both his individual and estate tax returns for 2009. Accordingly, the Court finds that the Debtor has not violated § 1112(b)(4)(I) because he properly filed individual and estate tax returns for 2009.

**3. Section 1129(a)(3)**

Section 1129(a)(3) requires that "[t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The term "good faith" as used in this section is not defined by the Bankruptcy Code. *In re Madison Hotel Assocs.*, 749 F.2d 410, 424 (7th Cir. 1984). "'[T]he term is generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" *203 N. LaSalle St. P'ship*, 126 F.3d at 969 (*quoting Madison Hotel*, 749 F.2d at 424-25). In evaluating whether a plan has been proposed in good faith, the focus of the inquiry is the plan itself, which must be viewed based on the totality of the circumstances surrounding the development and proposal of that plan. *Madison Hotel*, 749 F.2d at 425; *SM 104 Ltd.*, 160 B.R. at 244.

To be in good faith, a plan must have "a true purpose and fact-based hope of either 'preserving [a] going concern' or 'maximizing property available to satisfy creditors.'" *S. Beach Sec.*, 606 F.3d at 376 (*quoting Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999)). To find that a plan does not comply with § 1129(a)(3) generally requires "misconduct in bankruptcy proceedings, such as fraudulent misrepresentation or serious nondisclosures of material facts to the court." *In re River Vill. Assocs.*, 161 B.R. 127, 140 (Bankr.

E.D. Pa. 1993), *aff'd*, 181 B.R. 795 (E.D. Pa. 1995). "Good faith is not synonymous with honesty and bad faith is not synonymous with dishonesty." *In re Jackson*, 91 B.R. 473, 475 (Bankr. N.D. Ill. 1988) (Chapter 13 case).

The Seventh Circuit has produced a non-exclusive list of factors embodied in its "totality of the circumstances" test to consider in determining good faith in Chapter 13 cases. They include (1) whether the plan states secured and unsecured debts accurately; (2) whether expenses are accurately disclosed; (3) whether the percentage distribution to unsecured claimants is accurate; (4) whether inaccuracies in the plan amount to an attempt to mislead the court; and (5) whether the proposed payments show fundamental fairness in dealing with one's creditors. *In re Smith*, 848 F.2d 813, 817-22 (7th Cir. 1988); *In re Rimgale*, 669 F.2d 426, 432-33 (7th Cir. 1982). *See also In re Smith*, 286 F.3d 461, 466 (7th Cir. 2002); *In re Love*, 957 F.2d 1350, 1355 (7th Cir. 1992); *In re Schaitz*, 913 F.2d 452, 453-54 (7th Cir. 1990). While these factors were considered with respect to good faith in Chapter 13 cases, they are still relevant and inform part of the Court's inquiry here in this Chapter 11 case.

It is appropriate to consider both the use of a debtor's income during the pendency of a Chapter 11 case and a debtor's projected use of that income after confirmation. *In re Weber*, 209 B.R. 793, 798-99 (Bankr. D. Mass. 1997). This is especially significant here because Dynegy argues that the Plan has not been proposed in good faith because the Debtor manipulated the bankruptcy process to protect certain insiders, and he has failed to make adequate disclosures in the case.

Dynegy maintains that the Plan improperly treats the claims of Bruria and Lipshitz by allowing a $40,000 per year payment to fund a life insurance policy for their benefit. In addition,

Dynegy argues that a portion of Lipshitz's claim is improperly treated under the Plan as a secured claim. Finally, Dynegy asserts that the Plan's proposed payment of a priority claim for a $300,000 domestic support obligation to Bruria is unfounded and without documentation. As noted previously, the Court reserves ruling on these contested claims until resolution of the claim objections filed by Dynegy. Nevertheless, the Court acknowledges that there are highly contested issues of fact with respect to those claims and the Court lacks documentation to determine the propriety of the treatment of Bruria and Lipshitz under the Plan. Specifically, Lipshitz filed his proof of claim as a general unsecured creditor (Claims Register No. 28), but the Plan proposes that part of his claim is to be treated as secured and that the Debtor will maintain a trust funded by a life insurance policy for his benefit. (Debtor Ex. No. 5 § 2.1.7.) Additionally, while the Plan provides for a priority claim for a $300,000 domestic support obligation to be paid to Bruria (*Id.* at § 4.9), the Debtor testified that he has no documentation to support how much he paid Bruria for domestic and child support pre-petition and he does not know what, if any, is still due and owing. (Trans. 218:16 - 221:24.) Without ruling on the propriety of the Plan's treatment of the claims of Bruria and Lipshitz, the Court recognizes that the issues surrounding those claims bear on whether the Plan was proposed in good faith.

Next, the Court considers whether the Debtor has accurately disclosed projected expenses. Exhibit H of the Disclosure Statement projects that the Debtor will incur $60,000 of "miscellaneous expenses" for the first two years and $65,000 for the last three years of the Plan. (Debtor Ex. No. 6, Ex. H.) Those miscellaneous expenses are separate and apart from his mortgage, insurance, real estate taxes, and utility expenses. The Court questions how, in good faith, the Debtor could project only $60,000 of miscellaneous expenses for year one when for the

period between February 2010 and January 2011, the Debtor spent $211,539.70 on food, entertainment, travel, and various household expenses, which do not include utilities, insurance, taxes, or mortgage payments. (*See* Ex. A to the Opinion.) This is more than three years worth of the Debtor's projected miscellaneous expenses under the Plan. Indeed, the Debtor's monthly operating reports filed in this case show the Court that the Debtor has chosen not to tighten his belt, but has continued to live a lavish lifestyle while in Chapter 11 to the detriment of his creditors. Courts have denied confirmation of plans where it was found that debtors had not tightened their belts. *See Weber*, 209 B.R. at 800; *In re McNichols*, 249 B.R. 160, 170 (Bankr. N.D. Ill. 2000) (Chapter 13 case); *In re Fernandez*, 97 B.R. 262, 263 (E.D.N.C. 1989) (indicating that any plan filed by the debtor which proposed to retain his monthly salary to support his lavish lifestyle may be unconfirmable).

While the Debtor might argue that $60,000 a year in miscellaneous expenses is substantial "belt-tightening" compared to his more than $210,000 discussed above, the Court remains skeptical. For one, the Debtor projects $50,000 a year in charitable donations. (Debtor Ex. No. 6, Ex. H.) While charitable donations are allowed, the Debtor's projected donations are half of his projected net disposable income. Furthermore, the Court notes that the Plan proposes to pay $100,000[17] per year for the benefit of Lipshitz and Bruria in addition to the unsecured portion of their claims. This evidences the Plan's failure to maximize assets available to satisfy the claims of the Debtor's unsecured creditors.

---

[17] This total is the sum of $60,000 per year to Bruria for a priority claim for a domestic support obligation and $40,000 per year for a life insurance policy which funds a trust for the benefit of Bruria and Lipshitz.

In the *Weber* case, the court denied confirmation of a Chapter 11 plan where the debtor's lifestyle was unreasonable and excessive which the court found offensive to the integrity of the bankruptcy system. *Weber*, 209 B.R. at 800. The court looked to the debtor's disposable income to determine whether the plan had been filed in good faith. *Id.* at 799. The court found that test to be a useful guide in determining whether the debtor committed sufficient resources to fund the plan. *Id.* The court then looked at the debtor's monthly expenses and found that many were extravagant. *Id.* In refusing to confirm the plan for failure to meet the good faith requirement, the court opined that the plan sent a message "that an individual may file a Chapter 11 petition and continue to live in luxury while paying a relative pittance to creditors. The purpose of the Bankruptcy Code is to provide the debtor with a fresh start, not to preserve a debtor's extravagant lifestyle." *Id.* at 800.

As mentioned previously and as reflected in his monthly operating reports, the Debtor has chosen not to tighten his belt during the course of his Chapter 11 case. For example, in January 2011, the Debtor took an apparent vacation to Hawaii as evidenced by numerous debit card purchases such as the $1,677.65 charge for the Ritz-Carlton Hotel in Kapalua, Hawaii on January 5, 2011.[18] (Docket No. 648 at p. 4.) Furthermore, the Debtor's monthly operating reports reflect exorbitant expenditures for household expenses, food, entertainment, and travel. The Debtor's household expenses do not include mortgage, food, utilities, or cable and telephone expenses.

---

[18] Because Dynegy's Exhibit 15 does not include the monthly operating reports for November 2010 through January 2011, which the Court includes in its analysis, the Court takes judicial notice of those reports that are docketed as numbers 597, 631, and 648. *See In re Salem*, 465 F.3d 767, 771 (7th Cir. 2006) (taking judicial notice of dockets and opinions); *Frierdich v. Mottaz*, 294 F.3d 864, 870 (7th Cir. 2002) (taking judicial notice of bankruptcy schedules); *Wood*, 925 F.2d at 1582 (stating that the court may take judicial notice of matters of public record).

In March 2010, the Debtor spent $10,358.68 on household and sundry expenses. (Dynegy Ex. 15.) The Debtor's food expense for that month was $7,354.22. (*Id.*) In May 2010, the Debtor reported that he spent $11,559.25 on food and $6,424.24 on entertainment. (*Id.*) The next month, June 2010, the Debtor reported entertainment expenses of $12,724.71. (*Id.*) The Debtor reported $8,956.31 in entertainment expenses and $5,854.30 in household expenses in July 2010. (*Id.*) Total household, food, entertainment, and travel expenses for that month were $22,446.91, more than one-third of the Debtor's projected "miscellaneous" expenses for the entire first year of the Plan. (*Id.*)

Although the Debtor is not married and does not have any dependents, the monthly operating reports reflect expensive shopping excursions at women's clothing stores.[19] The Debtor has also withdrawn substantial amounts of cash from his individual bank account during the pendency of his Chapter 11 case. In fact, between January 2010 and January 2011, the Debtor withdrew over $70,000 from ATMs, not to mention checks he may have made out to cash. (*See* Ex. B. to the Opinion.)

In Dynegy's reply to its motion to dismiss or convert, it attached a response to a subpoena and request for production of documents from Horseshoe Casino Hammond, which was served upon Horseshoe on December 2, 2010 by the Examiner. (Docket No. 617, Ex. A.) That response supplied the Debtor's gaming history with Horseshoe Casino Hammond from January 2008 through October 2009. The Court notes that on August 27, 2009 and October 26, 2009, the

---

[19] On March 25, 2010, the Debtor spent $695.13 at Victoria's Secret. (Dynegy Ex. No. 15.) On October 13, 2010, the Debtor spent $1,745.02 at Anthropologie. (*Id.*) The Debtor spent $287.98 at Bebe and $167.54 at Victoria's Secret on December 13, 2010. (Docket No. 631.)

Debtor gambled at the casino. Both dates are post-petition and evidence the fact that the Debtor has continued to gamble through the pendency of this bankruptcy case.

While casino gambling is not illegal, it is completely unnecessary and unreasonable. The Court finds that such conduct by the Debtor shows a complete lack of regard for repayment of his creditors. Moreover, the Debtor's post-petition gambling is offensive to the integrity of the bankruptcy system. *See Weber*, 209 B.R. at 800. The notion of casino gambling with estate money is inherently contrary to the fiduciary standards to which debtors-in-possession are held. A Chapter 11 debtor-in-possession holds its power in trust for the benefit of creditors and has a duty to protect and conserve estate property for their benefit. *Fulton State Bank v. Schipper (In re Schipper)*, 109 B.R. 832, 835 (Bankr. N.D. Ill. 1989), *aff'd*, 112 B.R. 917 (N.D. Ill. 1990), *aff'd*, 933 F.2d 513 (7th Cir. 1991). It is far too risky to gamble at casinos where all games are structured to favor the house and not the gambler. The Debtor has chosen selfish pursuits over his fiduciary duty to the estate and his creditors.

As in the *Weber* case, these facts indicate to the Court that the Debtor has shown an intent to utilize the bankruptcy process for his own benefit. Furthermore, the Debtor has demonstrated a flagrant unwillingness to maximize his assets in order to pay his unsecured creditors. The Debtor's excessive and unnecessary expenditures and extravagant lifestyle do not manifest a fundamental fairness in dealing with his creditors.

It appears to this Court that the Plan will not achieve a result consistent with the objectives and purposes of the Bankruptcy Code. The discharge provided by the Bankruptcy Code is meant to effectuate the "fresh start" goal of bankruptcy relief. *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002). That fresh start, however, is reserved for the "honest but unfortunate

debtor." *Grogan v. Garner*, 498 U.S. 279, 287 (1991). The Debtor here is neither "honest" nor "unfortunate." Rather, the totality of the circumstances shows the Debtor's attempt to manipulate the system to the detriment of his creditors. The unsecured creditors are to be paid only a fraction of their claims while the Debtor continues to live an opulent lifestyle. Accordingly, the Court finds that the Plan does not satisfy the good faith requirement of § 1129(a)(3). Therefore, Dynegy's objection on this point is sustained.

**4. Section 1129(a)(4)**

Section 1129(a)(4) requires that payments made by the debtor "for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case" be approved as reasonable or subject to the court's approval. 11 U.S.C. § 1129(a)(4). "Section 1129(a)(4) requires that the court exercise substantive control over fees and costs related to confirmation and the Chapter 11 case." *Sentinel*, 398 B.R. at 316. It is "'designed to insure compliance with the policies of the Code that (1) the bankruptcy court should police the awarding of fees in title 11 cases and (2) holders of claims and interests should have the benefit of such information as might affect the claimants' decision to accept or reject the plan.'" *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 145-46 (Bankr. D.N.J. 2010) (*quoting In re Journal Register Co.*, 407 B.R. 520, 537 (Bankr. S.D.N.Y. 2009)).

Section 1129(a)(4) has two requirements.

> First, there must be disclosure. This will almost always happen during the disclosure statement process; fees and costs of this type will rarely be so small or insignificant that their existence and amount will not be of interest to the reasonable investor. Second, the court must approve of such costs, or such costs must be subject to review at a later time.

7 *Collier on Bankruptcy* ¶ 1129.02[4], at 1129-30 (Alan N. Resnick & Henry J. Sommer eds. 16th ed. 2010). *See also In re Beyond.com Corp.*, 289 B.R. 138, 144 (Bankr. N.D. Cal. 2003). A proposed plan need not contain specific provisions mandating that all post-confirmation payments be subject to court approval. *In re Briscoe Enters., Ltd., II*, 138 B.R. 795, 809 (N.D. Tex. 1992), *rev'd on other grounds*, 994 F.2d 1160 (5th Cir. 1993).

Dynegy makes arguments with respect to § 1129(a)(4) in two separate sections. It is first discussed with respect to § 1129(a)(2). Dynegy asserts that the Debtor is in violation of § 1129(a)(4) because in August 2010, the Debtor caused Multiut to make a one-time rent payment to LCF Associates ("LCF") in the amount of $52,535 for overdue rent, thereby diminishing Multiut's assets. Dynegy asserts that the post-petition rent was only $2,000 per month and that it was delinquent fourteen and one half months, totaling $29,000.

Dynegy produces no legal support for its contention that a debtor's actions with respect to another bankruptcy proceeding are relevant to the Court's analysis under § 1129(a)(4) in this bankruptcy. Section 1129(a)(4) is specifically limited to actions "in or in connection with the case." Though the Debtor is involved in the Multiut bankruptcy and the Debtor is a guarantor on Multiut's debt to Dynegy, it cannot be said that the Debtor's making a rent payment to LCF is "in connection with" *this* bankruptcy case. Dynegy's argument is rejected.

Dynegy later argues, in a separate section, that compensation to the Liquidation Trustee has not been fully disclosed in that the Plan and Disclosure Statement in violation of § 1129(a)(4). Dynegy argues that creditors cannot predict or estimate the Liquidation Trustee's fees based on the explanation provided by the Disclosure Statement. The Disclosure Statement provides, in relevant part, that:

> The Liquidation Trustee shall be entitled to compensation in accordance with the provisions of section 326 of the Bankruptcy Code and reimbursement of all reasonable out-of-pocket expenses that the Liquidation Trustee incurs. The compensation and expense reimbursement for the Liquidation Trustee and any professionals employed by him will be paid only in such amounts as may be allowed by the Bankruptcy Court upon proper application therefore.

(Debtor Ex. No. 6, pp. 37-38.)

As stated above, § 1129(a)(4) requires only that costs and expenses be disclosed and subject to court approval. The Disclosure Statement explains that the Liquidation Trustee's fees are to be calculated in accordance with § 326 of the Code and, thus, he will receive payment based on the amount he recovers and disburses under the Liquidation Trust Agreement. (*Id.*) Exhibit L to the Disclosure Statement estimates the Liquidation Trustee's fees as well as those of his attorney. (*Id.* at Ex. L.) The Debtor's disclosure of the Liquidation Trustee's fees is adequate under § 1129(a)(4) and those fees are subject to the Court's approval. Dynegy's argument is rejected.

Dynegy further argues that the Debtor's stated intention to fund the MDL does not comply with § 1129(a)(4) because the Plan does not provide for the Court's approval of the payments. The Debtor did not testify that he definitely intended to fund the MDL. He testified that if Multiut were unwilling or unable to fund it, he would be willing to do so to the extent Multiut were unwilling or unable. (Trans. 380:25 - 381:4.) The Plan does not require the Debtor to fund the MDL. The Debtor's stated willingness does not make it an issue for the Court to consider at this time, and his willingness to fund the MDL does not violate § 1129(a)(4). Therefore, Dynegy's objection on this basis is overruled.

**5. Section 1129(a)(7)**

Section 1129(a)(7) provides that each holder of an impaired claim who has rejected a plan must "receive or retain under the plan on account of such claim . . . property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive . . . if the debtor were liquidated under chapter 7 . . . on such date." 11 U.S.C. § 1129(a)(7)(A)(ii). This section is often referred to as the "best-interest-of-creditors" test. *203 N. LaSalle St. P'Ship*, 526 U.S. at 441. "Best interest" means that either (1) each holder of a claim or interest of each class has accepted the plan or (2) the nonaccepting class member will receive under the plan at least as much as it would receive upon liquidation. *See* 11 U.S.C. § 1129(a)(7)(A). All claimants in a class of claims that is impaired under the proposed plan must be accorded treatment under the plan at least as good as treatment they would receive upon the liquidation of the debtor under Chapter 7. *Rusty Jones*, 110 B.R. at 373. The best interests valuation is to be based on evidence not assumptions, but it is not an exact science. *In re MCorp Fin., Inc.*, 137 B.R. 219, 228 (Bankr. S.D. Tex. 1992). "'The best interests test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan.'" *Keck, Mahin & Cate*, 241 B.R. 583, 590 (Bankr. N.D. Ill. 1999) (*quoting 203 N. LaSalle St. P'ship*, 526 U.S. at 442 n.13).

Dynegy contends that the Plan fails to meet the best interests test because the Plan fails to prove with any certainty the value of the distribution under the Plan to Dynegy or any other dissenting creditors. Dynegy first argues that the Debtor failed to present any evidence regarding the present value of the $500,000 which is promised under the Plan. While Dynegy raises this as an objection, it fails to expound upon it. The Court presumes Dynegy's argument rests on the principle that future payments are worth less than current payments and that $500,000 over five

years does not equal $500,000 today. Nevertheless, the Debtor's post-confirmation contribution of $500,000 should increase the distribution to creditors. Moreover, the Debtor proposes to pay $100,000 for the Retained Assets and the Future Associates Assets, while estimating the value of those assets at $30,350. (Debtor Ex. No. 5 § 6.2.1; Debtor Ex. No. 6, Ex. L.) Whether or not the Debtor's estimate is correct, it appears to the Court that the Debtor is paying more for those assets than they are worth.

Next, Dynegy complains that the Debtor failed to present any evidence of the value of the assets to be transferred to the Liquidation Trust, the value of any potential recovery claims to be transferred to the Liquidation Trust, a potential recovery estimate from the Liquidation Trust, or the discounted present value of Dynegy's potential distribution. Dynegy's argument with respect to the value of the assets to be transferred to the Liquidation Trust consists of two sub-arguments. First, the Debtor did not provide an estimate of potential recovery claims and, second, neither the Debtor nor his accountant was qualified to value the assets.

The Debtor testified that he and his accountant sat down to value the assets. (Trans. 17:17 - 22; 113:11 - 15.) The valuation was based on the Debtor's business experience and what the Debtor and the accountant believed to be the current value and then applied a percentage discount for liquidation value. (*Id.* at 17:17 - 22; 35:21 - 36:2.) While the Debtor's valuation of his own assets is to be afforded some weight, *see S. Cent. Livestock Dealers, Inc. v. Sec. State Bank of Hedley, Tex.*, 614 F.2d 1056, 1061 (5th Cir. 1980); *In re Jester*, 344 B.R. 331, 339 (Bankr. E.D. Pa. 2006), the Debtor failed to provide any independent appraisals or other extrinsic evidence. Additionally, the Debtor offered little explanation for the great degree of variance between the assets' anticipated value in a Chapter 7 liquidation and their value in a Chapter 11 liquidation.

For example, the Debtor listed $2,530,000 as the Chapter 11 liquidation value of his stocks and interests in companies and partnerships, but listed $1,757,500 as their Chapter 7 liquidation value. (Debtor Ex. No. 6, Ex. E.) Within those stocks and interests, the Debtor values Better Energy Services & Technology ("BEST") in his Chapter 11 liquidation at $10,000 while valuing his interest in a Chapter 7 liquidation at $2,000. The Debtor offered no testimony regarding the five-fold difference in those values.

Dynegy's contention that neither the Debtor nor his accountant was qualified to value the assets is bolstered by the fact that the Debtor's own valuation numbers are incomprehensible. The Debtor took to estimating the liquidation values of his various entity interests. The Debtor scheduled the value of Embassy Holdings, LLC ("Embassy") at $1,200,000, but listed the estimated net sale value at $50,000 and its Chapter 7 liquidation value at $0. (*Id.*) MNRE was scheduled at $300,000 with an estimated net sale value of $10,000 and $0 in a Chapter 7 liquidation. (*Id.*) In the notes on Exhibit E, the Debtor explains that a sale of MNRE to a fifty percent partner is possible. (*Id.*) How the Debtor came to value these assets in such a way is perplexing and seriously calls into question the validity of his methodology.

In addition, the Debtor lists litigation claims against Dynegy, Greenberg, and Multiut, but fails to estimate the potential value of those claims. (*Id.*) *See In re Polis*, 217 F.3d 899, 902 (7th Cir. 2000) (stating that legal claims must be valued based on the expected judgment amount to be obtained multiplied by the probability of success). However, at trial the Debtor seemingly had such knowledge, estimating the potential recovery from Greenberg as between $5 and $15 million. (Trans. 38:8-14.)

The Debtor argues that Chapter 11 is better for creditors because a Chapter 7 trustee may not be willing to advance the costs required to pursue the Illinois Litigation and the MDL, as the Debtor testified he is willing to do. (*Id.* at 64:23 - 65:8; 360:3 - 8.) However, the Debtor's net disposable income projections listed on Exhibit H to the Disclosure Statement do not account for any potential litigation costs. If the Debtor assumed these costs, it would severely impact his ability to pay the Liquidation Trust the promised $100,000 per year.

Moreover, the Debtor failed to even list as an asset any potential claims against insiders. While the failure to estimate or include these claims may not impact the value to the estate under Chapter 11 or 7, it bears on the accuracy of the Debtor's methodology.

Dynegy also argues that the Debtor fails to provide a potential recovery estimate which creditors might receive from the Liquidation Trust. The Debtor's liquidation valuation lists total estimated recovery under Chapter 11 and under Chapter 7, with the estimated recovery for Chapter 11 being greater than for Chapter 7. Exhibit L to the Disclosure Statement provides a detailed summary of the estimated range of payments to unsecured creditors. Dynegy's argument on this point has no merit.

Finally, Dynegy asserts that the costs and expenses of the Liquidation Trust are not included in the Debtor's valuation analysis. This argument has already been addressed in the Court's analysis of § 1129(a)(4).

In sum, the Court finds that the Debtor has not carried his burden of showing that the best interests test has been met. The basis of the Debtor's valuation of the assets is questionable at best and as a result of the unreliable methodology the Debtor has used to value his assets, the Court cannot determine that creditors will fare better in Chapter 11 than they would in a Chapter

7 liquidation. The Court acknowledges that the creditors might receive more in Chapter 11 because the Debtor has committed $500,000 of post-petition income which he would not be required to contribute in Chapter 7. Furthermore, the Court recognizes that the sale of the Debtor's interests in certain of his businesses would yield a higher market price in the Chapter 11 process as going concerns rather than in a Chapter 7 liquidation. Nevertheless, the Debtor's methodology in valuing his assets is suspect and the Court cannot determine whether the values assigned to the assets will actually yield a higher dividend for the creditors in a Chapter 11 liquidation. The Court sustains the objection on this point.

**6. Section 1129(a)(8)**

Section 1129(a)(8) mandates that each class of claims or interests has accepted the plan or is not impaired under the plan. *In re 4 C Solutions, Inc.*, 302 B.R. 592, 596 (Bankr. C.D. Ill. 2003). The Debtor is unable to meet this requirement because Class 11 is an impaired class and voted against the Plan. Therefore, the Plan must comply with the requirements of § 1129(b) in order to be confirmed. The Court will address § 1129(b) in § IV.B. of this Opinion.

**7. Section 1129(a)(9)**

In a Chapter 11 plan of reorganization, all administrative claims must be paid in full under a Chapter 11 plan of reorganization unless the claim holder agrees to different treatment. 11 U.S.C. § 1129(a)(9)(A); *Sentinel*, 398 B.R. at 316. Administrative expenses include "the actual, necessary costs and expenses of preserving the estate[.]" 11 U.S.C. § 503(b)(1)(A).

An entity with an administrative expense may file a request with the bankruptcy court under § 503(a) that the court then "allows" under § 503(b) after notice and a hearing. *In re Telesphere Commc'ns, Inc.*, 148 B.R. 525, 530 n.13 (Bankr. N.D. Ill. 1992). When a party is

induced to supply goods or services to the estate, § 503(b) requires that those expenses be afforded administrative priority. *In re Jartran, Inc.*, 732 F.2d 584, 586 (7th Cir. 1984).

Dynegy argues that the Plan fails to provide for payment of all administrative expenses because the Debtor failed to make his October 2010 mortgage payment on the property located at 1202 Towpath Lane, Wilmington, Illinois (the "Towpath Property"). On this basis, Dynegy asserts that the Plan fails to meet § 1129(a)(9) because the holder of the mortgage, Bank of America has a right to receive an administrative expense distribution.

On November 6, 2009, the Court entered an order requiring the Debtor to maintain regular monthly payments on the Towpath Property. (Dynegy Ex. No. 33.) The Debtor testified that as far as he knew, no one has been making payments on the Towpath Property and Bank of America was told "they can have the property." (Trans. 139:11 - 15.) When asked whether he has retained possession of the Towpath Property, the Debtor responded "Sort of, kind of." (*Id.* at 129:2 - 6.) The Debtor admitted that the Plan does not provide for the payment of administrative claims to Bank of America. (*Id.* at 130:5 - 13.)

The Plan provides for all allowed administrative expenses to be paid in full on the effective date of the Plan (the "Effective Date"). (Debtor Ex. No. 5 § 4.0.1.) It defines administrative expense claims as "any cost or expense of administering the Chapter 11 case allowable under Section 503(b) of the Bankruptcy Code, including any fees or charges assessed against the estate under Chapter 123 of Title 28 of the United States Code." (*Id.* § 2.0.) The Debtor's summary of professional fees submitted at trial listed a balance due at confirmation of $301,271.96 with a balance in the administrative expense escrow account of $331,817.85.